UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOGWATCH, INC., a Massachusetts corporation, | )<br>)<br>)<br>) |
| Plaintiff, | ) CIVIL ACTION<br>) NO. 04-CV-12048-MLW |
| v. | )<br>) |
| RUSTY BROUSSARD; JULIE BROUSSARD; and PETSTOP OF LOUISIANA, a Louisiana business entity, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

FILED
IN CLERKS OFFICE

2004 OCT 15 A 10: 44

U.S. DISTRICT COURT
DISTRICT OF MASS.

## AMENDED COMPLAINT

### Introduction

In this action for declaratory judgment and damages, DogWatch, Inc. ("DogWatch"), a manufacturer of animal restraint systems, seeks relief in connection with a former dealer's attempts to impede DogWatch from contacting DogWatch customers; its improper efforts to induce other DogWatch dealers to breach their contracts with DogWatch; and its breach of its dealer agreement with DogWatch.

### The Parties

1.  Plaintiff DogWatch, Inc. (hereinafter "DogWatch") is a Massachusetts corporation, with its principal place of business at Ten Michigan Drive, Natick, Massachusetts. DogWatch is in

the business of, among other things, marketing, distributing, and selling electronic animal restraint systems.

2. Defendant PetStop of Louisiana ("Dealer") is a Louisiana business entity with its principal place of business at 219 East LeBlanc, Maurice, Louisiana 70775. For some years, Dealer was an authorized dealer in DogWatch electronic animal restraint systems, and did business under the name, "DogWatch of Louisiana."

3. Defendants Rusty Broussard and Julie Broussard (the "Broussards") are individuals who reside in Maurice, Louisiana. On information and belief, the Broussards, from at least 1997 to the present, have been Dealer's owners, officers and directors, and the conscious, active, and dominant force behind Dealer's unlawful acts in this judicial district.

4. For purposes of this Complaint, PetStop of Louisiana and Defendants Rusty and Julie Broussard, will be referred to, collectively, as "Defendants."

## Jurisdiction and Venue

5. This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), because a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and a substantial part of the property at issue is situated here.

7. As set forth below, an actual controversy exists for purposes of 28 U.S.C. § 2201 with respect to the parties' respective rights, duties, and obligations under a dealer relationship between DogWatch and Defendants, and under applicable state law.

**Background**

8. For a number of years, DogWatch has been in the business of marketing, distributing and selling electronic animal restraint systems, including "hidden fence," electronic training and other animal containment products. The DogWatch animal restraint system has been promoted widely by DogWatch, and has received extensive publicity. In April 1998, the DogWatch animal restraint system was featured in Consumer Digest, and was awarded Consumer Digest's coveted "Best Buy" award.

9. DogWatch animal restraint products are marketed through a nationwide network of authorized dealers. Applications for DogWatch dealerships are received, processed

and screened by DogWatch at its corporate headquarters in Natick, Massachusetts.

10. In order to be accepted as a DogWatch dealer, each dealer is required to execute a Dealer Agreement, under Massachusetts law, which contains various terms, conditions, and obligations.

11. Among other things, the Dealer Agreement binds the prospective dealer to deal exclusively in DogWatch products, and to "use . . . best efforts to create, increase, and satisfy a demand for [DogWatch] products," using a Customer Order Form provided by DogWatch.

12. The DogWatch Customer Order Form, which is used by dealers to obtain orders under the Dealer Agreement, includes a free lifetime-warranty option, under which "any transmitter installed by an authorized dealer, equipped with a DogWatch Lightning Surge Protector, and grounded to DogWatch Inc. specifications, will be warranted for as long as the original owner owns the system."

13. To obtain the benefits of this free lifetime warranty, customers and dealers must sign the Customer Order Form and submit it to DogWatch's home office in Massachusetts. The information contained on the form, submitted to Dogwatch, thereafter becomes property of DogWatch. It may be used by DogWatch in contacting customers, servicing equipment,

fulfilling the company's warranty obligations, or for any other lawful purpose.

### Defendants' Dealer Relationship With DogWatch

14. In 1997, DogWatch entered into a dealer relationship with Defendants. The relationship, which was governed by the terms of the DogWatch Dealer Agreement, permitted Defendants to serve as an exclusive dealer of DogWatch products in the Lafayette, Louisiana area.

15. Defendants' dealer relationship with DogWatch lasted from 1997 to 2004. During this period, Defendants were in close and continuous contact with DogWatch management, in Natick, Massachusetts. They attended DogWatch annual dealer meetings. They maintained a leadership role in the DogWatch dealer organization, and served on the DogWatch Dealer Advocate Group. On one occasion, they were named by DogWatch as "Dealer of the Year." They were intimately aware of DogWatch practices and procedures, and of the standard terms that governed the relationship between DogWatch and its authorized dealers.

16. Specifically, Defendants were aware of the terms and conditions of the DogWatch Dealer Agreement and the Customer Order form. At no time did Defendants ever voice any objection to these terms or conditions. At no time did Defendants ever

indicate, through words or conduct, that they did not understand themselves to be bound by these terms.

## COUNT I
### (Breach of Contract)

17. DogWatch incorporates by reference the allegations of paragraphs 1 through 16 as if set forth in full herein.

18. As part of the dealer relationship between Defendants and DogWatch, Defendants committed to deal exclusively in DogWatch products, and to "use . . . best efforts to create, increase, and satisfy a demand for [DogWatch] products," using the Customer Order Form provided by DogWatch.

19. As part of the dealer relationship between Defendants and Dogwatch, Defendants committed to submit (or assist customers in submitting) warranty information to DogWatch, and acknowledged that this warranty information, once submitted, became the property of DogWatch.

20. The dealer agreement between Defendants and DogWatch was terminable by either party, on thirty days' written notice.

21. On May 12, 2004, DogWatch acquired evidence that Defendants, in breach of their dealer agreement with DogWatch, were advertising themselves as dealers for PetStop, a competing manufacturer of animal restraint systems; and were marketing and

promoting the competing products made and distributed by PetStop.

22. DogWatch immediately contacted Defendants to confront them with this evidence. Defendants, after being confronted, verified that they had in fact signed a dealer agreement with PetStop, and were selling PetStop products.

23. Defendants' activities, in entering into a dealer relationship with PetStop, and in marketing and distributing PetStop systems prior to May 12, 2004, constituted a breach of the dealer agreement between DogWatch and Defendants. Defendants took no steps to terminate their dealer relationship with DogWatch prior to May 12, 2004, when DogWatch confronted Defendants with the evidence of Defendants' breach.

24. In terminating their relationship with DogWatch, and entering into a relationship with PetStop, Defendants did not comply with the provisions of their dealer agreement with DogWatch. Among other things, and without limitation, Defendants did not provide DogWatch with thirty days' notice of termination, as the parties' agreement required.

25. Defendants' failure to provide notice of termination of their dealer relationship with DogWatch was knowing and intentional, and was intended by Defendants to inflict commercial harm on DogWatch, by, among other things, denying DogWatch an opportunity to transfer Defendants' DogWatch

dealership to others, and to set into place mechanisms for the servicing and upgrading of DogWatch equipment.

26. On information and belief, since leaving DogWatch, Defendants have attempted to persuade other DogWatch dealers to walk away from their dealer agreements, *en masse*, without honoring the thirty-day transition provision, in a manner calculated to inflict maximum commercial harm on DogWatch, its sales network, and its product lines.

27. As a direct and proximate result of Defendants' wrongful conduct, described above, Defendants have been unjustly enriched, and DogWatch has suffered and will continue to suffer lost sales and other substantial injury and damage to its business, including injury and damages to DogWatch's goodwill, and to its general reputation, and to its reputation in the trade, the amount of this damage exceeding $75,000.

## COUNT II
### (Declaratory Judgment)

28. DogWatch incorporates by reference the allegations of paragraphs 1 through 27 as if set forth in full herein.

29. Following the termination of Defendants' dealer relationship with DogWatch, DogWatch management attempted to mitigate the damages caused by Defendants' actions, by contacting those customers in Defendants' dealership area who had submitted warranty information to DogWatch.

30. In this communication, among other things, DogWatch advised customers that they could contact DogWatch's customer service department, in Massachusetts, if they had questions or problems with their warranted DogWatch equipment, or if they needed additional equipment. DogWatch also advised customers that DogWatch was seeking a qualified individual to represent the DogWatch product line, and invited customers to contact DogWatch if they were interested in this opportunity.

31. DogWatch's communications with these DogWatch customers were valid, legitimate, authorized, and within DogWatch's legal rights.

32. On September 21, 2004, Defendants, through counsel, sent a letter to DogWatch management in Natick, Massachusetts. The letter demanded that DogWatch cease and desist all contacts with DogWatch customers, in Defendants' former dealership region, whose equipment had been warranted by DogWatch.

33. In their September 21, 2004 letter, Defendants took the position that the warranty information submitted to DogWatch - in connection with warranties extended by DogWatch, on DogWatch equipment - constituted "confidential and propriety information," owned by *Defendants*, and that DogWatch could not use that information, without Defendants' permission, even to support the DogWatch warranties for which the information originally was submitted.

34. Defendants further advised DogWatch that if DogWatch did not immediately cease and desist further use of the warranty information, Defendants would file suit against DogWatch for unfair business practices. The amount in controversy in such a proceeding would exceed $75,000, exclusive of interest and costs.

35. Pursuant to 28 U.S.C. § 2201, *et seq.*, DogWatch is entitled to a judicial declaration that it is the owner of the customer warranty information that was submitted by Defendants on its behalf, and that it may use the information for any lawful purpose, including, *inter alia*, the fulfilment of warranty obligations on DogWatch equipment.

36. Declaratory relief is appropriate because an actual controversy exists between the parties with respect to the issues presented.

### COUNT III
### (Disparagement)

37. DogWatch incorporates by reference the allegations of paragraphs 1 through 36 as if set forth in full herein.

38. For some time, DogWatch has maintained a proprietary e-mail distribution list, for the internal use of DogWatch and its dealers. The e-mail distribution list permits authorized parties to obtain access to, and communicate with, the entire DogWatch dealership network.

39. On at least one occasion, on Monday, September 20, 2004, Defendants, through a confederate, made use of the proprietary DogWatch e-mail network to distribute to DogWatch dealers a lengthy, hostile communication, the purpose and effect of which was to persuade DogWatch dealers to "officially switch" and join Defendants as PetStop dealers.

40. Defendants' September 20, 2004, communication was sent with the subject line, "DOGWATCH DEALER ALERT," in an apparent effort to "pass off" the communication as an official communication from DogWatch management, in Massachusetts; and thereby to raise concern and alarm among active DogWatch dealers.

41. In the course of the September 20, 2004 communication, Defendants made a number of false and defamatory statements to the DogWatch dealer community. These false and defamatory statements disparaged the integrity and business methods of DogWatch, imputed dishonesty to DogWatch and its management, and were intended to, and did, injure DogWatch in its trade and business.

42. In addition to the false and defamatory statements in the September 20, 2004 communication, Defendants, in the course of this communication, and in other communications with DogWatch dealers, encouraged DogWatch dealers to submit "bogus

information" to DogWatch, in Natick, Massachusetts, in order to frustrate the fulfilment of DogWatch's warranty obligations.

43. As a direct and proximate result of Defendants' wrongful conduct, described above, Defendants have been unjustly enriched, and DogWatch has suffered and will continue to suffer lost sales and other substantial injury and damage to its business, including injury and damages to DogWatch's goodwill, and to its general reputation, and to its reputation in the trade, the amount of this damage exceeding $75,000.

## COUNT IV
### (Interference with Existing and Prospective Business Advantage and/or Relations)

44. DogWatch incorporates by reference the allegations of paragraphs 1 through 43 as if set forth in full herein.

45. During the time period relevant to this Complaint, Defendants were aware of existing and prospective business relations between DogWatch, in Massachusetts, and its nationwide dealer network, with respect to the provision of DogWatch products and services.

46. Defendants have tortiously, maliciously and intentionally interfered with such relationships, with improper motive, and through improper means, as alleged above.

47. As a direct and proximate result of Defendants' wrongful conduct, described above, Defendants have been unjustly

enriched, and DogWatch has suffered and will continue to suffer lost sales and other substantial injury and damage to its business, including injury and damages to DogWatch's goodwill, and to its general reputation, and to its reputation in the trade, the amount of this damage exceeding $75,000.

## COUNT V
### (Unfair Competition)

48. DogWatch incorporates by reference the allegations of paragraphs 1 through 47 as if set forth in full herein.

49. Through their conduct, as described above, Defendants have placed themselves in competition with DogWatch, in the business of distributing and selling electronic animal restraint systems.

50. Defendants' conduct, as described above, constitutes improper, wrongful and unfair methods of competition under common law.

51. As a direct and proximate result of Defendants' wrongful conduct, described above, Defendants have been unjustly enriched, and DogWatch has suffered and will continue to suffer lost sales and other substantial injury and damage to its business, including injury and damages to DogWatch's goodwill, and to its general reputation, and to its reputation in the trade, the amount of this damage exceeding $75,000.

## COUNT VI
### (Breach of Duty of Good Faith and Fair Dealing)

52. Plaintiffs reallege and reincorporate by reference the allegations contained in Paragraphs 1 through 51, above.

53. Through the actions described above, Defendants have breached the implied duties of good faith and fair dealing found in every contractual relationship.

54. As a direct and proximate result of Defendants' wrongful conduct, described above, Defendants have been unjustly enriched, and DogWatch has suffered and will continue to suffer lost sales and other substantial injury and damage to its business, including injury and damages to DogWatch's goodwill, and to its general reputation, and to its reputation in the trade, the amount of this damage exceeding $75,000.

## REQUEST FOR RELIEF

WHEREFORE, DogWatch requests that this Court:

A.  enter judgment in favor of DogWatch, and against Defendants, on each count of the Complaint;

B.  declare, on Count II of the Complaint, that DogWatch is entitled to utilize the warranty information submitted to it, and to contact those customers who have submitted warranty

information, in order to advise them of warranty, product, and related developments;

C.   determine, on Counts I and III-VI of the Complaint, the amount of the damages that have been incurred by DogWatch due to Defendants' wrongful acts, as alleged above, and enter a judgment against Defendants in the amount of such damages, plus multiple and punitive damages as appropriate;

D.   determine, on Counts I and III-VI of the Complaint, the amount of the profits or other benefits that have been obtained by Defendants as a consequence of its wrongful acts, as alleged above, and order disgorgement, by Defendants, in the amount of such profits;

E.   award punitive and exemplary damages against Defendants, and in favor of DogWatch, as set forth above, to the extent authorized by law;

F.   award DogWatch the costs, including reasonable attorneys' fees, that it has incurred in bringing and maintaining this action;  and

G.   award such other and additional relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff requests jury trial on all issues so triable.

Respectfully submitted,

DOGWATCH, INC.,

By counsel,

_____
Eric Hermanson, Esq.
   (BBO #560256)
CHOATE, HALL & STEWART
Exchange Place, 53 State Street
Boston, MA 02109
(617) 248-5000

Dated:
October 15, 2004

3749585v2

16